IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> ) <br> ) <br> JOSEPH MILLER ) <br> ) <br> Defendant. ) <br>_____) | CRIM. No. 04-240-E-BLW <br><br> MEMORANDUM DECISION <br> AND ORDER |

## INTRODUCTION

The Court has before it a motion to suppress filed by the Defendant. The Court heard testimony and argument on May 9, 2005, and the motion is now at issue. For the reasons expressed below, the Court will deny the motion.

## FACTUAL BACKGROUND

On July 30, 2004, at about 10:40 p.m., Miller was driving along Highway 30 near Soda Springs, Idaho in a car which he did not own and which had Colorado license plates. His passenger was Patricia Herron.

There is no dispute that Miller was speeding. Jon Bunderson of the Soda

**Memorandum Decision & Order – page 1**

Springs Police Department pulled in behind Miller and turned on his flashing lights. Miller testified that he saw the lights but did not immediately pull over because he was concerned about being hit on the side of the road by the big trucks he had seen pass by. Officer Bunderson testified that Miller was taking an unusually long period of time to pull over, and that both Miller and his passenger were engaging in furtive movements inside the car.

Eventually, Miller turned on a side road and pulled over. Officer Bunderson approached the car from the passenger side, and could smell alcohol through the open window. While talking to Miller, he could smell alcohol on Miller's breath. He also noticed that Herron appeared to be under the legal age for the consumption of alcohol.

After obtaining Miller's license and the car's registration, and recognizing that the car was not registered to Miller, Officer Bunderson requested from dispatch two record checks. The first was a simple evaluation of Miller's driving record, while the second was a more detailed analysis known as a "Triple I" check.

The Triple I check takes somewhat longer to run. Officer Bunderson said he ordered the Triple I check due to the fact that (1) Miller was driving a car with out-of-state plates registered to someone else, (2) Miller had denied consuming alcohol but his breath smelled of alcohol, (3) Miller and Herron were engaging in furtive

**Memorandum Decision & Order – page 2**

movements before they pulled over, and (4) Miller took an unusually long period of time to pull over.

While continuing his questioning of Miller and Herron, Officer Bunderson discovered a handgun partially concealed between the front seat and the console. It was loaded with a round in the chamber. Officer Bunderson took the gun and removed the bullets.

By this time, Officer Bunderson had determined that Herron was underage, and she admitted to drinking alcohol. Officer Bunderson then decided to deploy the drug-sniffing dog he had with him.

Officer Bunderson had worked with this dog for ten years, and had nearly a thousand hours of training on handling drug-sniffing dogs. The dog had over a thousand positive drug finds in the past.

As the dog went around the exterior of the car, he alerted on both the passenger-side window and the trunk. Officer Bunderson then let the dog into the car, where the dog alerted on Herron's purse. Officer Bunderson examined the purse and discovered rolling papers and a digital scale. While in the backseat, the dog alerted on the cushions of the back seat as if it was trying to get into the trunk. Because the dog had also alerted on the trunk while walking around the exterior, Officer Bunderson searched there and discovered the guns that form the basis for

**Memorandum Decision & Order – page 3**

this action.

The testimony, and dispatch logs, show that about 12 to 15 minutes elapsed between the time of the stop and the time that the dog was deployed.  At the time the dog was deployed, Officer Bunderson was still waiting for dispatch to notify him of the results of the Triple I records check.  The testimony establishes that he had called in that check about 3 to 5 minutes after stopping Miller.

## ANALYSIS

There is no dispute that Miller's speeding providing initial probable cause for the traffic stop.  Deployment of a drug dog during a lawful traffic stop is not a "search" within the Fourth Amendment.  *Illinois v. Caballes*, 125 S.Ct. 834, 837 (2005).

Nevertheless, "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Id.* at 837.  A seizure that is justified solely by the interest in issuing a speeding ticket to the driver can become unlawful if "it is prolonged beyond the time reasonably required to complete that mission." *Id.*

In *Caballes*, the Supreme Court noted that the lower court had reviewed the interaction between the officer and the defendant, along with dispatch logs, to calculate the amount of time between the stop and the deployment of the drug dog.

**Memorandum Decision & Order – page 4**

*Id*. Although the Court did not discuss the precise timing involved in the case, the Court did hold that "we accept the state court's conclusion that the duration of the stop in this case was entirely justified by the traffic offense and the ordinary inquiries incident to such a stop." *Id.*

As set forth above, this Court has also examined the interaction between the officer and the defendant, and examined the dispatch logs.  Those facts show that Officer Bunderson promptly called in the Triple I check about 3 to 5 minutes after stopping Miller.  While that check takes somewhat longer to run than a more simple check, it was justified due to the unusually long time Miller took to pull over, the furtive movements Officer Bunderson saw in the car, the smell of alcohol, and finally the fact that Miller was driving a car that was not registered to him and that had out-of-state plates.

For these reasons, it was reasonable for Officer Bunderson to call in the Triple I check, and continue the stop for a reasonable time until he got the results. Officer Bunderson deployed the drug dog while waiting for those results, and just 12 to 15 minutes after the stop was initiated.  Under these circumstances, the Court cannot find that the stop had been unreasonably delayed at the time the dog was deployed.

Additional briefing submitted by the parties after the hearing revealed case

authority that a drug dog alert establishes probable cause to search so long as the drug dog has been shown to be reliable. *U.S. v. Ligenfelter*, 997 F.2d 632 (9th Cir. 1993). Reliability would appear to be a function both of the skill of the dog and the ability of the dog's handler.

Here, the Court finds that the Government has established the necessary reliability. The testimony set forth above shows that the dog had a large number of confirmed drug finds over the past decade, and that Officer Bunderson had been well-trained in using a drug dog.

Thus, the dog's alert on the trunk gave probable cause to Officer Bunderson to search the trunk. For all these reasons, the Court finds that the motion to suppress shall be denied.

## ORDER

For the reasons expressed in the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the Motion to Suppress (docket no. 13) is DENIED.

DATED: **May 13, 2005**

B. LYNN WINMILL
Chief Judge
United States District Court

**Memorandum Decision & Order – page 6**